UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x
KATHY-ANN VAUGHN, et al.,

                    Plaintiffs,

     -against-                       <u>MEMORANDUM AND ORDER</u>
                                         06-CV-6547 (ILG)

CITY OF NEW YORK, et al.,

                    Defendants.

-------------------------------------------------x

GLASSER, United States Senior District Judge:

      Plaintiffs Kathy-Ann Vaughn ("Vaughn"), Angela Cammarata ("Cammarata"), Christelene Henry ("Henry"), Emily Francis ("Francis"), and Carol Davis ("Davis") have brought an action against defendants the City of New York ("City"), the New York City Department of Education ("DOE"), Denise Jennings ("Jennings"), and Michele Williams ("Williams") under 42 U.S.C. §§ 1981, 1983, and 2000e, alleging discrimination on the basis of Caribbean national origin, as to plaintiffs Henry and Davis, discrimination on the basis of alienage, and, except as to plaintiff Davis, retaliation for engaging in protected activities. Defendants move for summary judgment.[1] The Court finds that, except as to Vaughn's retaliation claim, plaintiffs have been unable to make a *prima facie* showing of either discrimination or retaliation. Accordingly, the Court grants the motion for summary judgment as to all Title VII, § 1981, and § 1983 equal protection claims of Cammarata,

---

[1] Although defendants ask for summary judgment as to "all of plaintiffs' claims," Defs.' Br. 2, their memorandum of law is completely devoid of argument as to defendants' § 1983 claims. Because of the substantial overlap between plaintiffs' § 1983 equal protection claims and their discrimination claims under Title VII and § 1981, these claims are fairly within defendants' motion for summary judgment. Plaintiffs' § 1983 due process claims, however, are not addressed by this ruling.

Henry, Francis, and Davis, and Vaughn's Title VII and §1983 discrimination claims, finding that, on the basis of the undisputed facts, defendants are entitled to judgment as a matter of law.

## BACKGROUND

### 1. School Administration

Prior to September 2003, the Principal at Science Skills Center High School ('SSCHS') was Robert Sinclair ('Sinclair'), who is of Caribbean national origin. Defendants' Local Rule 56.1 Statement ('Defs.' 56.1 Statement'), dated September 17, 2008, at ¶6; Plaintiffs' Local Rule 56.1 Statement ('Pls.' 56.1 Statement'), dated July 2, 2009, at ¶6. Defendant Jennings, whose grandfather was of Caribbean national origin, was appointed Assistant Principal of SSCHS in September 2001 and, in September 2003, took over from Sinclair as Principal. Defs.' 56.1 Statement ¶45; Pls.' 56.1 Statement ¶45. Defendant Williams was the Assistant Principal of Science and Mathematics at SSCHS from 2000 until 2008. Defs.' 56.1 Statement ¶7; Pls.' 56.1 Statement ¶7. Nancy Baldwin ('Baldwin'), Colette Caesar ('Caesar')[2], Gil Cornell ('Cornell'), and Zuri Jackson-Woods ('Jackson-Woods') also served as Assistant Principals at SSCHS during some or all of the relevant time period. See Defs.' 56.1 Statement ¶80.

### 2. Kathy-Ann Vaughn

Vaughn was born in Barbados. Defs.' 56.1 Statement ¶30; Pls.' 56.1 Statement ¶30. She began working at SSCHS as a math teacher in 2001. Defs.' 56.1 Statement ¶31; Pls.' 56.1 Statement ¶31. During the course of her employment, Vaughn has been subject to a number of negative evaluations, letters, and memoranda written by members of the SSCHS administration,

---

[2] Caesar is the complainant in another discrimination complaint filed in the Equal Employment Opportunity Commission ("EEOC") against the City of New York and the DOE which alleges, *inter alia*, discrimination on the basis of Caribbean national origin.

including: notices concerning absences and lateness; unsatisfactory lesson evaluations; an accusation of insubordination; and notices of failure to submit lesson plans and other paperwork. Defs.' 56.1 Statement ¶ 37, 41-42, 44, 46-48, 51, 53, 58-59, 61, 63-64, 75; Pls.' 56.1 Statement ¶ 37, 41-42, 44, 46-48, 51, 53, 58-59, 61, 63-64, 75. Finally, Vaughn received an unsatisfactory rating for the 2006-2007 school year which cited deficiencies in a number of evaluative categories. Defs.' 56.1 Statement ¶ 76-77; Pls.' 56.1 Statement ¶ 76-77. In addition, Vaughn has been subject on multiple occasions to student and parent complaints over alleged verbal abuse, which have led to multiple reports to the DOE's Office of Special Investigations. Defs.' 56.1 Statement ¶ 32-36, 66-67, 70-72; Pls.' 56.1 Statement ¶ 32-36, 66-67, 70-72. Vaughn also received several satisfactory lesson evaluations during this time period, received satisfactory ratings for 2003-2004, 2004-2005, and 2005-2006 school years, and became tenured on September 12, 2004. Defs.' 56.1 Statement ¶ 38-39, 43, 45, 50, 52, 54, 60, 74; Pls.' 56.1 Statement ¶ 38-39, 43, 45, 50, 52, 54, 60, 74.

### 3. Angela Cammarata

Cammarata was born in Trinidad and Tobago. Defs.' 56.1 Statement ¶ 152; Pls.' 56.1 Statement ¶ 152. She was a tenured guidance counselor at SSCHS. Defs.' 56.1 Statement ¶ 153; Pls.' 56.1 Statement ¶ 153. During the course of her employment at SSCHS, Cammarata was subject to a number of negative evaluations, letters, and memoranda written by members of the SSCHS administration, including: reprimands for various forms of misbehavior including unprofessional conduct, distributing materials without approval, failure to follow school directives, conducting an unauthorized investigation of students, and making a threat against an administrator; notices of parent complaints regarding provision of incorrect information and unprofessional behavior; an unsatisfactory lesson evaluation; and notices of school absences and lateness. Defs.' 56.1 Statement ¶ 155, 157-159, 161-162, 164-168, 171-174, 177, 179-182, 184-187;

Pls.' 56.1 Statement ¶ 155, 157–159, 161–162, 164–168, 171–174, 177, 179–182, 184–187.  Cammarata

received unsatisfactory ratings for the 2004–2005 and 2005–2006 school years, which included

unsatisfactory ratings in multiple evaluative categories.  Defs.' 56.1 Statement ¶ 169–170, 189–190;

Pls.' 56.1 Statement ¶ 169–170, 189–190.  On August 31, 2006, Cammarata was advised by letter

that she had been reassigned to Region 8 Human Resources pending the outcome of disciplinary

charges, and on May 8, 2007, Cammarata was advised by letter that she had been suspended with

pay.  Defs.' 56.1 Statement ¶ 191, 197; Pls.' 56.1 Statement ¶ 191, 197.  Cammarata also received

several satisfactory lesson evaluations during her employment at SSCHS and received a

satisfactory rating for 2003–2004 school year.  Defs.' 56.1 Statement ¶ 154, 163, 176, 183, 188; Pls.'

56.1 Statement ¶ 154, 163, 176, 183, 188.

### 4. Christelene Henry

Henry was born in Granada.  Defs.' 56.1 Statement ¶ 85; Pls.' 56.1 Statement ¶ 85.  She

began working at SSCHS as an English teacher in 2001.  Defs.' 56.1 Statement ¶ 86; Pls.' 56.1

Statement ¶ 86.  During the course of her employment, Henry has been subject to a number of

negative evaluations, letters, and memoranda written by members of the SSCHS administration,

including:  a request for an OSI investigation regarding alleged verbal abuse of two students;

reprimands for distributing inappropriate materials to students, for moving her classroom without

authorization, for inadequate classroom management, for failure to post student work, and for

insubordination; notices of absences and lateness; and unsatisfactory lesson evaluations.  Defs.'

56.1 Statement ¶ 88–91, 93–94, 99–101, 108, 110–116, 118, 120; Pls.' 56.1 Statement ¶ 88–91, 93–94, 99–

101, 108, 110–116, 118, 120.  Henry received an unsatisfactory rating for the 2006–2007 school

year.  Defs.' 56.1 Statement ¶ 122; Pls.' 56.1 Statement ¶ 122.  Henry had earlier received a

satisfactory lesson evaluation, satisfactory ratings for the 2003–2004, 2004–2005, and 2005–2006

school years, and became tenured on September 11, 2004. Defs.' 56.1 Statement¶ 97-98, 103-104, 106; Pls.' 56.1 Statement¶ 97-98, 103-104, 106.

### 5. Emily Francis

Francis was born in Jamaica. Defs.' 56.1 Statement¶ 131; Pls.' 56.1 Statement¶ 131. She began working at SSCHS as a Library Science Teacher in the 1990s. Defs.' 56.1 Statement¶ 132; Pls.' 56.1 Statement¶ 132. During her employment, Francis has received several warnings regarding her absences and lateness. Defs.' 56.1 Statement¶ 135, 140-141, 143; Pls.' 56.1 Statement¶ 135, 140-141, 143. On June 14, 2005, Jennings denied a request by Francis to excuse several days' absence as due to a line of duty injury. Defs.' 56.1 Statement¶ 136; Pls.' 56.1 Statement¶ 136. Jennings subsequently approved the request on June 27, 2005. Defs.' 56.1 Statement¶ 137; Pls.' 56.1 Statement¶ 137. Francis received several satisfactory lesson evaluations during this period and satisfactory ratings for the 2003-2004, 2004-2005, 2005-2006, and 2006-2007 school years. Defs.' 56.1 Statement¶ 133, 138, 142, 144-146; Pls.' 56.1 Statement ¶ 133, 138, 142, 144-146.

### 6. Carol Davis

Davis was born in Jamaica. Defs.' 56.1 Statement¶ 2; Pls.' 56.1 Statement¶ 2. In 2002, she was assigned to SSCHS as a probationary chemistry teacher. Defs.' 56.1 Statement¶ 3; Pls.' 56.1 Statement¶ 3. Davis received a several reprimands during her one year at SSCHS, including warnings for: unsafe conditions in Davis's laboratory classes; failure to submit grades on time; and excessive lateness to school. Defs.' 56.1 Statement¶ 9-10, 12-14, 16, 19, 22; Pls.' 56.1 Statement¶ 9-10, 12-14, 16, 19, 22. Williams observed Davis's class several times and in each instance gave her an unsatisfactory lesson evaluation. Defs.' 56.1 Statement¶ 11, 15, 18, 20-21;

Pls.' 56.1 Statement ¶¶ 11, 15, 18, 20-21.   On one occasion, Sinclair observed Davis's class and gave

her a satisfactory evaluation.  Defs.' 56.1 Statement ¶ 17; Pls.' 56.1 Statement ¶ 17.  At the

completion of the 2002-2003 school year, Davis received an unsatisfactory rating.  Defs.' 56.1

Statement ¶ 23; Pls.' 56.1 Statement ¶ 23.  The discontinuation of her probationary service was

recommended, and Davis was subsequently terminated.  Defs.' 56.1 Statement ¶¶ 24-25; Pls.' 56.1

Statement ¶¶ 24-25.

## PROCEDURAL HISTORY

On April 20, 2006, Plaintiffs filed a complaint with the Equal Employment Opportunity

Commission ("EEOC") alleging discrimination on the basis of Caribbean national origin.  Defs.'

56.1 Statement ¶¶ 28, 83, 123, 147, 198; Pls.' 56.1 Statement ¶¶ 28, 83, 123, 147, 198.  On September

11, 2006, the EEOC issued right-to-sue letters to each of the plaintiffs informing them that their

EEOC cases had been closed.  Defs.' 56.1 Statement ¶¶ 29, 84, 124, 148, 199; Pls.' 56.1 Statement

¶¶ 29, 84, 124, 148, 199.  Plaintiffs filed the instant complaint in this Court on December 8, 2006.

On September 18, 2008, Defendants filed a motion for summary judgment.  Oral argument was

heard on October 16, 2009.

## DISCUSSION

### 1.  Statutes of Limitations

#### a.  Title VII

Title VII requires, as a prerequisite to filing suit, the exhaustion of administrative

remedies.  Specifically, before filing suit, a plaintiff must have "filed a timely complaint with the

EEOC and obtained a right-to-sue letter." Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274

F.3d 683, 686 (2d Cir. 2001) ("Exhaustion of administrative remedies through the EEOC is 'an

essential element" of the Title VII . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal court."); see also Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003) ("As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC."). If the EEOC complaint is not timely filed, a civil action is similarly time-barred. Butts v. City of New York Dept. of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds, Civ. Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071; Flaherty v. Metromail Corp., 235 F.3d 133, 136 n.1 (2d Cir. 2000) ("To sustain a claim for unlawful discrimination under Title VII . . . a plaintiff must file administrative charges with the EEOC within 300 days of the alleged discriminatory acts."); Benjamin v. Brookhaven Sci. Assoc., LLC, 387 F. Supp. 2d 146, 152 (E.D.N.Y. 2005).

"Generally, a claim must be filed within 180 days of the alleged discriminatory act. However, if the act occurs in a state which has laws prohibiting the type of discrimination of which a plaintiff complains and an agency to enforce such laws, then the claimant must file with the EEOC within 300 days." Subramanian v. Prudential Sec., Inc., No. CV016500 (SJF) (RLM), 2003 WL 23340865, at *3 (E.D.N.Y. Nov. 20, 2003) (noting that the 300 day limit applies in New York, "which has anti-discrimination laws and an enforcement agency"). "New York is a so-called 'deferral state.' Under 42 U.S.C. § 2000e-5(e)(1), plaintiff has 300 days from the act complained of to file an administrative charge with the state deferral agency of the EEOC." Canales-Jacobs v. New York State Office of Court Admin., 640 F. Supp. 2d 482, 501 (S.D.N.Y.

2009); see also Butts, 990 F.2d at 1401. The Court now considers whether plaintiffs have complied with this administrative exhaustion requirement.[3]

Defendants argue that the Title VII claims of Henry, Francis, and Davis are barred because they did not timely file complaints with the EEOC. On September 11, 2006, the EEOC issued letters to Henry, Francis, and Davis, informing each of them that their cases had been closed as untimely filed. Plaintiffs in this case filed their EEOC complaint on April 20, 2006. In order to be timely, the alleged discriminatory conduct must have occurred within 300 days of the filing—that is, on or after June 24, 2005.

The last specific instance of discriminatory conduct alleged by Henry in the EEOC complaint was an incident in or around March 2004, in which Henry alleged that she was reprimanded for distributing inappropriate classroom materials while a non-Caribbean teacher who distributed similarly inappropriate materials was not. Declaration of Isaac Klepfish ("Klepfish Decl."), dated September 25, 2008, Ex. QQQQQQ, EEOC Complaint ¶ 11(C)(o)–(s). This is well outside the 300-day limitation period and is thus time-barred. Henry also complained that she "began to receive write-ups in her mail box almost every week during the period of September 2004 to June 2005." Id. ¶ 11(C)(v). The vague phrasing of this allegation ("almost every week") and the failure to specify an end date does not allow this Court to conclude that the EEOC complaint alleges conduct on or after June 24, 2005. The last incident alleged by Francis in the EEOC complaint was the denial of injury-in-the-line-of-duty leave days on June 7,

---

[3] Title VII administrative exhaustion typically also requires that the defendants were named in the EEOC complaint. Johnson v. Palma, 931 F.2d 203, 209 (2d Cir. 1991). There is an exception, however, when there is "a clear identity of interest between the unnamed defendant and the party named in the administrative charge. " Id. In this case, plaintiffs' EEOC complaint names only the DOE as a respondent to its charges. Klepfish Decl., Ex. QQQQQQ, EEOC Complaint. The City, Jennings, and Williams have not raised any argument regarding their absence as defendants in the EEOC complaint, and thus any such argument is waived and the Court will assume a sufficient identity of interest exists.

2005, id. ¶11(D)(q)-(r), and the final act complained of by Davis was her termination on or about

September 2, 2003, id. ¶11(E)(g). Thus, the EEOC complaint was untimely as to Henry, Francis,

and Davis. None of these plaintiffs has argued that any legal justification for the late filing, such

as waiver or equitable tolling, applies, and they are thus barred from bringing their Title VII

claims in this Court.

The EEOC complaints of Vaughn and Cammarata, unlike those of Henry, Francis, and

Davis, were not found by the EEOC to be untimely. Rather, on September 11, 2006, the EEOC

issued right-to-sue letters to Vaughn and Cammarata, indicating that their claims had been closed

because the EEOC was unable to conclude that a statutory violation had occurred. Although the

EEOC did not find Vaughn's and Cammarata's complaints untimely and defendants have not

challenged the timeliness here, because the complaints allege a series of events occurring over a

period of several years, this Court must determine which of the alleged acts in the complaint are

in fact timely. Because timeliness must be determined as to each discriminatory act alleged in

the complaint, generally only those acts alleged to have occurred within the limitations period

are timely. 'Each incident of discrimination and each retaliatory adverse employment decision

constitutes a separate actionable 'unlawful employment practice,' and each discriminatory act

starts a new clock for filing charges alleging that act.' Benjamin, 387 F. Supp. 2d at 152-53

(internal quotes omitted).

The only act in Cammarata's EEOC complaint that could potentially have been timely

was the year-end unsatisfactory rating that she received in June 2005. Klepfish Decl., Ex.

QQQQQQ, EEOC Complaint ¶11(B)(k). The undisputed facts in evidence before this Court,

however, make clear that this unsatisfactory rating was received on June 15, 2005, more than 300

days prior to the filing of the EEOC complaint. Defs.' 56.1 Statement ¶169; Pls.' 56.1 Statement

¶169. See Butts, 990 F.2d at 1403-04 (holding that when EEOC complaint is timely only on the basis of vague dates, "the district court only may hear the [] claims insofar as they relate to acts occurring on or after [300 days prior to the EEOC filing]"). Because Cammarata's complaint to the EEOC was thus untimely, her Title VII claim cannot be maintained in this Court.

The only act alleged in Vaughn's complaint subsequent to June 24, 2005 is the reassignment of Vaughn's classroom in September 2005. Klepfish Decl., Ex. QQQQQQ, EEOC Complaint ¶ 11(A)(z). Having established, however, that at least one act was alleged within the limitations period, the Court must consider whether other allegations in the complaint may also be considered. There are two exceptions to the general exhaustion requirement which might allow the consideration of additional allegations. First, allegations in the EEOC complaint that would be otherwise time-barred may be considered if they form part of a "continuing violation" with timely alleged acts. Benjamin, 387 F. Supp. 2d at 153. Second, allegations not made in the EEOC complaint, including actions alleged to have occurred subsequent to the filing with the EEOC, may be considered if they are "reasonably related" to the timely allegations in the EEOC complaint. Butts, 990 F.2d at 1402. Each of these exceptions will be considered in turn.

"The continuing violation doctrine extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations. Benjamin, 387 F. Supp. 2d at 153 (internal quotes omitted). This doctrine recognizes that an individual discriminatory act "may not be actionable on its own" and that when multiple acts "are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 118 (2002). The continuing violation doctrine does not allow the indiscriminate revival of time-barred allegations. "[D]iscrete acts

cannot be transformed into a single unlawful practice for the purposes of timely filing."

Benjamin, 387 F. Supp. 2d at 153 (internal quotes omitted); see also id. ("[A]lleged adverse employment practices such as failure to promote, failure to compensate adequately, undesirable work transfers, and denial of preferred job assignments are considered discrete acts.").

The relevant question, then, is whether the timely act in Vaughn's complaint alleges a discrete act or one of a series of separate acts that collectively constitute a single unlawful employment practice. The EEOC Complaint describes Vaughn's reassignment as an act of retaliation for participating in a demonstration alleging anti-Caribbean discrimination by SSCHS. A retaliatory adverse employment action is a discrete act, Nat'l R.R. Passenger Corp., 536 U.S. at 114, and as such would not be part of a continuing violation with other acts outside the limitations period. On the other hand, Vaughn's complaint does characterize the purpose of the reassignment as placing her under the "constant supervision and scrutiny" of Williams. Klepfish Decl., Ex. QQQQQQ, EEOC Complaint ¶ 11(A)(z). Because the complaint contained multiple allegations of ongoing harassment, including allegations of discriminatory excessive scrutiny, id. ¶ 11(A)(j)–(o), (s), this could be construed as part of a continuing hostile work environment claim. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 568-569 (2d Cir. 2000) (court can construe complaint as raising hostile work environment claim, even when not explicitly alleged); cf. Benson v. North Shore-Long Island Jewish Health Sys., 482 F. Supp. 2d 320, 330 (E.D.N.Y. 2007) ("claims of harassment, such as yelling at the Plaintiff, making derogatory comments to the Plaintiff and issuing performance warnings" are not discrete acts). Vaughn's EEOC complaint, however, fails to allege any specific timely instances of discriminatory scrutiny, and thus there can be no timely hostile work environment claim.

"[A] plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 83 (2d Cir. 2001). The Second Circuit has recognized three categories of claims that meet the 'reasonably related' test: (1) claims which 'would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination'; (2) claims 'alleging retaliation by an employer against an employee for filing an EEOC charge'; and (3) claims alleging 'further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." Butts, 990 F.2d at 1402-03 (internal quotations omitted).

'In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving." Deravin, 335 F.3d at 201 (quotation and alteration omitted). The only timely alleged act in Vaughn's EEOC complaint is the alleged retaliatory room reassignment, so the Court must thus address what would fall within the scope of an EEOC investigation of this allegation. Because this is an allegation of retaliation for the demonstration in which Vaughn and others participated, an EEOC investigation would reasonably be expected to extend to additional alleged retaliatory acts following Vaughn's room reassignment. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 178 (2d Cir. 2005) ('A complaint of retaliation could reasonably be expected to inquire into other instances of alleged retaliation by the same actor." (internal quotation and alteration omitted)). Thus, any allegations in Vaughn's complaint that can reasonably be construed as alleging retaliation for Vaughn's participation in the demonstration are reasonably related to Vaughn's timely EEOC allegation, and thus are timely in this Court under Title VII.

Finally, an action for violation of Title VII must be filed within 90 days of receipt of a right-to-sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1). The complaint in this Court was filed on December 8, 2006, fewer than 90 days after the issuance of the right-to-sue letters on September 11, 2006, and the action is thus timely.

### b. § 1981

"[C]laims under 42 U.S.C. § 1981 and 1983 need not be asserted within the 180- or 300-day period applicable to Title VII claims." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). Discrimination and retaliation claims under § 1981 are governed by the general four year statute of limitations found in 28 U.S.C. § 1658. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004). Because the complaint was filed in this Court on December 8, 2006, events on or after December 8, 2002 are within the limitations period. Thus, both Davis's discrimination claim, which is based on her September 2, 2003 termination, Compl. ¶ 9(E), and Henry's discrimination and retaliation claims, which allege acts of discrimination beginning in 2003, Compl. ¶ 9(C), are timely.

### c. § 1983

Although Title VII covers some conduct which, when committed by a public employer, would violate the constitutional guarantee of equal protection, it does not displace the analogous cause of action under § 1983. Annis v. County of Westchester, N.Y., 36 F.3d 251, 254 (2d Cir. 1994) ("[I]t is clear that Congress did not intend to make Title VII the exclusive remedy for employment discrimination claims, at least not those claims cognizable under the Constitution."). 

"The statute of limitations applicable to claims brought under . . . §] 1983 in New York is three years." Patterson, 375 F.3d at 225. Plaintiff Davis's termination from SSCHS, the last

wrongful act she alleges in the complaint, occurred on September 2, 2003. Defs.' 56.1 Statement ¶ 25; Pls.' 56.1 Statement ¶ 25. This is more than three years prior to the filing of the complaint in this case and thus Davis's § 1983 claims are time-barred. At oral argument, Davis argued that because the appeal of her termination was not resolved until October 2004, Compl. ¶ 9(E)(i), this brings it within the statute of limitations. It is well settled, however, that the statute of limitations begins to run on a claim of wrongful termination at the time the notice of termination is given. Chardon v. Fernandez, 454 U.S. 6, 8 (1981) ("[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful."); Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 23 (2d Cir. 1985). The allegations of all other plaintiffs occurred within three years prior to the filing date of this lawsuit, and are thus timely.

### d. Summary

In summary, the statute of limitations bars the Title VII discrimination claims of all plaintiffs and the Title VII retaliation claims of all plaintiffs except Vaughn. Vaughn, Cammarata, Henry, and Francis may bring discrimination claims under § 1983, but Davis's § 1983 claims are time-barred. Henry may bring her discrimination and retaliation claims, and Davis may bring her discrimination claims under § 1981.

## 2. Legal Standard

### a. Summary Judgment

A party will be granted summary judgment when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that there exists no genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). If the moving party meets this burden, then it falls to the opposing

party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e)(2). The non-moving party "may not rely on mere conclusory allegations nor speculation,

but instead must offer some hard evidence showing that its version of the events is not wholly

fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). Furthermore, new

facts adduced by the non-moving party will not prevent summary judgment unless they

contradict the facts supporting the movant's case for summary judgment. Beal v. Lindsay, 468

F.2d 287, 291 (2d Cir. 1972).

In addition, it is important to clarify the burden of production in this case. The basic

framework for discrimination and retaliation cases, established by the Supreme Court in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to claims under Title VII,

§1981, and §1983. Id. at 802-07 (describing burden shifting framework for Title VII

discrimination claims); Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (applying

McDonnell Douglas burden-shifting framework to Title VII retaliation claim); Hudson v. Int'l

Bus. Machs. Corp., 620 F.2d 351, 354 (2d Cir. 1980) (applying McDonnell Douglas burden-

shifting framework to §1981 discrimination claims).

Under the McDonnell Douglas test, the initial burden is on the plaintiff to present a *prima

facie* case of discrimination or retaliation. McDonnell Douglas, 411 U.S. at 802. The precise

nature of the evidence that needs to be presented at this stage depends on the nature of the

misconduct being alleged. See id. at 802 n.13. Plaintiff's burden at this stage has been described

as *de minimis*. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). "Nevertheless, this

burden is not inconsequential." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 127 (2d Cir.

2004). Once the plaintiff has made this showing, the burden shifts to the defendant to put forth

some legitimate justification for the challenged action. <u>McDonnell Douglas</u>, 411 U.S. at 802-03. Once this showing is made, the burden falls once again to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. <u>Id.</u> at 807.

Thus, in the context of a motion for summary judgment, the defendant can prevail under the <u>McDonnell Douglas</u> standard either by demonstrating that the plaintiff cannot make the necessary *prima facie* showing, or by demonstrating that the plaintiff cannot rebut the defendant's proffered legitimate justification. "Summary judgment is appropriate even in discrimination cases" and "trial courts should not treat discrimination differently from other ultimate questions of fact." <u>Weinstock</u>, 224 F.3d at 41 (internal quotes omitted). Although the moving party bears the burden, a motion for summary judgment cannot be defeated "by offering purely conclusory allegations of discrimination, absent any concrete particulars." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).

### b. Discrimination Under Title VII, § 1981, and § 1983

The basic analytical framework for making a *prima facie* case under Title VII, § 1981, or §1983 is the same. A plaintiff can make a *prima facie* showing by demonstrating that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." <u>Weinstock</u>, 224 F.3d at 42 (*prima facie* case under Title VII); <u>Paulino v. New York Printing Pressman's Union, Local Two</u>, 301 F. App'x 34, 37 (2d Cir. 2008) (applying identical standard for *prima facie* discrimination case under §1981 and Title VII); <u>Cunningham v. New York State Dept. of Labor</u>, 326 F. App'x 617, 620 (2d Cir. 2009) ("[T]he analytical framework of a workplace equal protection claim[] parallels that of a discrimination claim under Title VII."). "The elements

of one are generally the same as the elements of the other and the two must stand or fall together."

Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004).

Although the standard to establish a *prima facie* case is not high, conclusory allegations alone are insufficient to support an inference of discrimination. Sharif v. Buck, 152 F. App'x 43, 44 (2d Cir. 2005); Meiri, 759 F.2d at 998. Furthermore, a prima facie case of discriminatory intent may be undercut by evidence which would counsel against such an inference. For example, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997).

Assuming that plaintiffs can establish a *prima facie* case of discrimination, defendants can prevail by proffering legitimate business reasons for any adverse actions and showing that plaintiffs are unable to show that these reasons are pretextual. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original); McCarthy v. New York City Technical Coll. of City Univ. of New York, 202 F.3d 161, 166 (2d Cir. 2000) ("[T]he mere fact of a pretext will not support a verdict of discrimination unless the circumstances make the finding reasonable."); Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001) (even if reasons are pretextual, plaintiff bears burden of showing actual discriminatory intent); James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000) ("[O]nce the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.");

Schnabel, 232 F.3d at 89-90 (evidence of pretext may also allow drawing of inference of discrimination).

Finally, unlike Title VII and §1983, §1981 does not address discrimination on the basis of national origin.  Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998).  It does, however, apply to discrimination on the basis of alienage, *i.e.* non-U.S. citizenship.  Id. at 171.  Thus, as plaintiffs implicitly concede in their brief in opposition, only the two non-citizen plaintiffs, Davis and Henry, can bring a claim under §1981.  Pls.' Br. 29-31.  It is critical to note that alienage discrimination is discrimination on the basis of citizenship status, not immigrant status.  Discrimination on the basis of a person's status as an immigrant to the United States is not alienage discrimination unless it is also motivated by the lack of U.S. citizenship.  See Ayiloge v. City of New York, No. 00 CIV. 5051(THK), 2002 WL 1424589, at *16 (S.D.N.Y. June 28, 2002) ("Alienage discrimination must be distinguished from national origin discrimination, which is based solely on an individual's birthplace or nation of origin, and is not prohibited by §1981.").  Although it may be difficult to disentangle in practice, the limited reach of §1981 makes this distinction crucial.

### c.  Retaliation Under Title VII and § 1981

In a retaliation case under Title VII or §1981,[4] the plaintiff must establish a *prima facie* case by showing "(1) participation in a protected activity;[5] (2) that the defendant knew of the

---

[4] Courts have generally found that claims alleging retaliation for opposing discriminatory practices are not cognizable under § 1983.  See Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); see also Gray v. Lacke, 885 F.2d 399, 414 (7th Cir. 1989) ("[Plaintiff's] right to be free from retaliation for protesting . . . discrimination is a right created by Title VII, not the equal protection clause.  Section 1983 provides a remedy for deprivation of constitutional rights.  It supplies no remedy for violations of rights created by Title VII." (citations omitted)).  But see Hicks v. Baines, 593 F.3d 159, 171 (2d Cir. 2010) ("The premise of this lawsuit is that plaintiffs were treated differently — that is, they suffered retaliation — on the basis of their participation in discrimination investigations and proceedings.  That participation obviously constitutes an 'impermissible' reason to

18

protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Jute, 420 F.3d at 173 (*prima facie* standard for Title VII, quoting McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001)); Paulino, 301 F. App'x at 37 (same standard for *prima facie* case of retaliation under § 1981 and Title VII). The fourth prong may be satisfied either through direct evidence of animus, or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).

In order to draw an inference based solely on timing, the temporal proximity of the protected acts and the alleged retaliation must be "very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). The Second Circuit has found a three-month gap between an employee's protected activity and the employer's alleged retaliation to be too distant to establish a causal nexus. Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990); but see Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 555 (2d Cir. 2001) (reviewing cases and finding no bright-line rule). Furthermore, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."

---

treat an employee differently."); cf. Choudhury v. Polytechnic Institute of New York, 735 F.2d 38, 43 (2d. Cir. 1984) ("When a complainant experiences retaliation for the assertion of a claim to even-handed treatment, he remains under a handicap not faced by his colleagues.").

    Because Hicks suggests that claims of retaliation for opposing national origin discrimination might, in fact, be cognizable under § 1983, the Court will address the retaliation claims of Cammarata, Henry, and Francis on the merits, even though their Title VII claims are time-barred.

[5] Importantly, "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied." McMenemy, 241 F.3d at 285. Rather, provided the plaintiff had a good faith, reasonable belief that he or she was opposing an unlawful employment practice, a claim for retaliation can be maintained. Id. Here, defendants have not disputed that plaintiffs engaged in protected activities.

<u>Slattery</u>, 248 F.3d at 95. An inference of causation based on timing is undercut if the plaintiff is also subject to favorable actions after engaging in the protected activity. <u>See</u> <u>Payton v. City Univ. of New York</u>, 453 F. Supp. 2d 775, 786 (S.D.N.Y. 2006).

### 3. Plaintiffs' Claims

#### a. Pattern or Practice of Discrimination

Plaintiffs argue that under Federal Rule of Evidence 404(b), which governs the admission of evidence of past acts by defendants,[6] the treatment of other foreign-born employees can be used as evidence of defendants' discriminatory intent.[7] The problem with plaintiffs' argument is that discriminatory intent is no more apparent from the unsatisfactory ratings given to other foreign born employees than it is from the treatment of the plaintiffs themselves. Plaintiffs allege that a number of foreign-born teachers received unsatisfactory ratings and other negative treatment from defendants. Plaintiffs name a total of four foreign-born teachers (Zafar, Garcia, Manzanares, and Adebowli) who received unsatisfactory ratings, one additional foreign born teacher (Kotenizansky) who did not received an unsatisfactory rating, but was excessed, *i.e.* laid off, and one foreign born teacher (Morin) who received a neutral (neither good nor bad) rating. Pls.' 56.1 Statement ¶¶ 201, 202; Pls.' Br. 3-4. Plaintiffs, however, fail to demonstrate why a valid inference of discrimination can be drawn from these acts, none of which was accompanied by overt evidence of discrimination.

---

[6] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, *intent*, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed. R. Evid. 404(b) (emphasis added).

[7] It is worth noting that plaintiffs' reference here to the treatment of non-Caribbean foreign born teachers casts some doubt on their repeated allegations of a specifically anti-Caribbean campaign on the part of Jennings and Williams.

The only actual evidence cited by plaintiffs to support the inference that these teachers were discriminated against on the basis of their national origin was the fact that Jennings commented on Mr. Morin's diction. Affirmation of Ambrose Wotorson ("Wotorson Aff."), dated July 1, 2009, Ex. 196, Deposition of Denise Jennings ("Jennings Dep."), dated January 15, 2008, at 86:17–21. Plaintiffs interpret this as a reference to his accent and then further argue that it supports an inference of discriminatory animus. A single remark concerning a teacher's intelligibility to his students, a matter of legitimate concern to the school administrators, is plainly insufficient to draw an inference of discriminatory animus toward all foreign born teachers generally. Plaintiffs also assert that another teacher, Mr. Zafar, believed that he was being harassed because he was foreign born. But a conclusory allegation is no more evidence when it purportedly comes from a third party[8] than when it comes from plaintiffs themselves.[9]

The only further relevance that the treatment of foreign teachers might have would be to establish a general pattern of treatment of foreign born teachers. Evidence that is essentially statistical in nature, for example, evidence of disproportionate treatment of members of different groups, may be sufficient to support an inference of discriminatory intent. <u>Krieger v. Gold Bond Bldg. Prods., a Div. of Nat'l Gypsum Co.</u>, 863 F.2d 1091, 1096–97 (2d Cir. 1988) (allowing

---

[8] This allegation is introduced through deposition testimony affirming knowledge of hearsay from an unidentified source.

> Q: Do you recall if Mr. Zafar ever said or suggested he felt he was being harassed because he was not American born or because he was originally an Iranian?
> A: No.
> Q: Are you saying that he never said that?
> A: Not to me.
> Q: Had you heard that before I asked this question?
> A: I would say yes.

Wotorson Aff. Ex. 196, Jennings Dep. 74:16–75:2.

[9] In addition to Zafar's supposed allegation, plaintiffs note that Assistant Principal Caesar has filed a separate complaint alleging discrimination on the basis of Caribbean national origin. Wotorson Aff. Ex. 203, EEOC Complaint of Colette Caesar. But although Caesar's complaint alleges disparate treatment of Caribbean and non-Caribbean teachers, it does not allege any knowledge of direct animus. Plaintiffs have provided no admissible evidence to accompany the complaint. If conclusory statements by plaintiffs are not sufficient to raise an inference of discrimination, then *a fortiori*, conclusory statements by a third party are not.

evidence of other acts to prove discriminatory intent); cf. Gaffney v. Dep't of Info. Tech. & Telecomms., 579 F. Supp. 2d 455, 460 (S.D.N.Y. 2008) ("[I]t is well established in the Second Circuit that one way to establish retaliation is to demonstrate that other people who have participated in protected activity have been treated adversely and similarly to plaintiffs.").

In this case, however, the evidence proffered by plaintiffs is simply not sufficient as a matter of law to warrant such an inference to be drawn. Although plaintiffs name several foreign-born teachers who they allege were subject to adverse treatment, they provide no context within which to evaluate this evidence. What is the ratio of foreign-born to native-born teachers at SSCHS? How many native-born teachers received unsatisfactory ratings or negative treatment comparable to that alleged of the foreign-born group? Without such context, plaintiffs have not even established that there is a "pattern," much less shown that a significant inference can fairly be drawn from such a pattern.[10] Dorfman v. Doar Commc'ns, Inc., 314 F. App'x 389, 391 (2d Cir. 2009) ("With respect to Appellant's generalized allegations about other individuals in the protected age group being fired, he fails to provide demographic and other information necessary to analyze this data, without which his allegations ha[ve] no logical tendency to show that discrimination was present." (quotations omitted)); see also Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 121 (2d Cir. 1997) ("Pollis's statistical evidence suffers from several serious flaws that render it insufficient to sustain a reasonable inference that her treatment by the New School was motivated by discriminatory intent."). Accordingly, the alleged pattern of treatment of foreign-born teachers is insufficient as a matter of law to support an inference of discrimination.

---

[10] Even evidence of disparities between groups will not necessarily support an inference of discrimination if the sample size is so small that disparities could as readily be attributed to chance. McCarthy, 202 F.3d at 165 ("[C]onsidered as statistical evidence, plaintiff's 'sample' of two was clearly insufficient to sustain a reasonable inference that [McCarthy's] treatment by the [college] was motivated by discriminatory intent." (quotations omitted)); Haskell v. Kaman Corp., 743 F.2d 113, 121 (2d Cir. 1984) ("The sample in the present case of ten terminations over an 11-year period is not statistically significant.").

### b. Kathy-Ann Vaughn

### i. Discrimination

Vaughn alleges that she has been subject to ongoing discriminatory treatment which has included negative lesson evaluations, unwarranted write-ups, a regime of micromanagement by Williams, and an unsatisfactory year-end rating. Defendants argue that Vaughn's claim must fail because she cannot show circumstances that would give rise to an inference of discriminatory intent, and thus cannot establish a *prima facie* case of discrimination.[11]

The clearest means of demonstrating discriminatory intent is through direct evidence of discriminatory animus. In this case, Vaughn has no such evidence. Vaughn is unable to identify statements from Jennings, Williams, or any other member of the SSCHS administration that reveal anti-Caribbean bias. Of course, this is not fatal to her case, and she could still prevail if she is able to present such indirect or circumstantial evidence as would allow a reasonable inference of discriminatory intent. Such evidence, however, is similarly lacking.

Vaughn strangely argues that an inference of discriminatory intent can be drawn from the fact that she herself was perceived as being anti-American or anti-African-American. Vaughn speculates that Jennings and Williams, both of whom are African-American, "learned about the allegations [of Vaughn's animus], became highly offended, and as a result, began to openly display animus towards Vaughn." Pls.' Br. 25-26. This argument is nonsensical. Jennings and Williams received complaints from parents and students characterizing Vaughn as anti-African-American. Defs.' 56.1 Statement ¶ 33-35; Pls.' 56.1 Statement ¶ 33-35. It might be a reasonable inference that Jennings and Williams, if they credited the accusations against Vaughn, might

---

[11] Defendants also argue that Vaughn cannot show that she has suffered any adverse employment action. Because Vaughn cannot show circumstances giving rise to an inference of discrimination, the Court need not reach the adverse employment action question.

have developed a personal animus against Vaughn.  But what Vaughn describes here is not animus on the basis of her national origin, but rather animus on the basis of Vaughn's perceived bigotry.  And personal animus not on account of national origin does not implicate the anti-discrimination laws.  Reece v. New York State Dep't of Taxation and Fin., 104 F.3d 354 (Table), 1996 WL 665625, at *3 (2d Cir. 1996) (summary judgment granted because plaintiff "has offered no facts that would support an inference of racial, rather than personal, animus").  This Court cannot credit as reasonable the assumption that Jennings and Williams, believing themselves subject to anti-African-American animus from Vaughn, would naturally be expected develop a reciprocal animus against persons of Caribbean national origin.

Having failed to show circumstances giving rise to an inference of discrimination, Vaughn's discrimination claim must fail and defendants are entitled to summary judgment.

## ii. Retaliation

Vaughn has engaged in several actions that could qualify as activities protected against retaliation by the anti-discrimination laws.[12]  First, in April 2004, Vaughn, along with other teachers, attended a meeting with members of the administration, including Jennings and Williams, at which they expressed their belief that the administration was engaging in anti-Caribbean discrimination.  Compl.¶9(A)(o); Pls.' Br. 6.  Later, on June 21, 2005, Vaughn participated in a demonstration accusing SSCHS of anti-Caribbean discrimination.  Wotorson

---

[12] The Supreme Court has held that some speech between government employees and supervisors is outside the protection of the First Amendment, and thus there is no constitutional protection against retaliation.  Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").  Even under Garcetti, however, Vaughn's activities would likely be fully protected.  See Weintraub v. Bd. of Educ. of City School Dist. of N.Y., 593 F.3d 196, 203 (2d Cir. 2010) (arguing, in dicta, that a teacher's internal grievances regarding a school's alleged racial discriminatory policies are protected by the First Amendment because they are "not in furtherance of the execution of one of her core duties as an English teacher").  In any event, because plaintiffs' bring retaliation claims under Title VII and not the First Amendment, Garcetti does not apply.

Aff. Ex. 191, Deposition of Kathy-Ann Vaughn ("Vaughn Dep."), dated January 31, 2008, at 129:1–3. The following day, she sent a letter to Williams in which she referenced the alleged campaign of discrimination against teachers of Caribbean national origin. Wotorson Aff. Ex. 104. In September 2005, Vaughn was reassigned to a different classroom, directly across from Williams's office. She alleges that this was the beginning of a "regimen of micromanagement," under which she was subjected to intensive and excessive scrutiny from Williams, leading to numerous disciplinary write-ups. Compl. ¶9(A)(y).

Defendants argue that Vaughn cannot demonstrate a causal connection between the alleged adverse actions and her protected activities. "A causal connection may be established either indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) (internal quotations omitted). Vaughn has provided no direct evidence of retaliatory animus. No member of the school administration threatened retaliation or indicated explicitly to Vaughn that actions were being taken as a result of her protected activities.

Vaughn must thus rely on indirect evidence of retaliatory animus. Vaughn has not identified any other employees who engaged in similar protected conduct and were treated differently, therefore Vaughn cannot argue for an inference of discrimination on the basis of disparate treatment. She does argue that because her picture appeared in the newspaper in relation to the demonstration, she became "an inevitable and obvious target of retribution," Pls.' Br. 32, but such conclusory statements cannot support the causal inference Vaughn seeks to draw.

Vaughn thus relies on the chronology of events in order to establish a causal connection. The meeting between teachers and the administration occurred in April 2004, while the first action characterized by Vaughn as retaliatory occurred in September 2005. This gap is far too long, as a matter of law, to support an inference of retaliation. See Miller v. Kempthorne, No. 08-2466-cv, 009 WL 4893670, at *2 (2d Cir. Dec. 21, 2009) ("[T]he one-year time frame here falls well beyond that contemplated by this Court as giving rise to such an inference."). In addition, Vaughn became tenured on September 12, 2004, Defs.' 56.1 Statement ¶ 39; Pls.' 56.1 Statement ¶ 39, which undercuts an inference that she was being retaliated against for her participation in the April 2004 meeting.

On the other hand, the gap between the June 21, 2005 demonstration and the alleged retaliatory room reassignment in September 2005 was less than three months. Furthermore, the demonstration occurred near the conclusion of the 2004–2005 school year, and the reassignment took effect at the start of the following school year. This lends some weight to the argument that the alleged retaliatory act followed the protected activity closely in time. See Mandell v. County of Suffolk, 316 F.3d 368, 384 (2d Cir. 2003) (longer gap in time doesn't preclude causal nexus if there is a reason for delay). The close temporal connection between the demonstration and the alleged retaliatory reassignment is therefore enough to satisfy the causal connection prong of the *prima facie* showing under the McDonnell Douglas framework.

Defendants additionally argue that Vaughn's retaliation claim cannot succeed because she has not been subject to an adverse employment action. Defendants argue that, as a matter of law, being subject to increased scrutiny cannot be an adverse employment action. The Supreme Court made clear in Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), that the standard for an adverse employment action in retaliation claims is considerably broader than the

standard for discrimination claims under Title VII. Unlike the discrimination provision of Title VII, which applies only to adverse actions affecting the terms and conditions of employment, the retaliation provision applies to actions "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." Id. at 68. The Court further explained that a reassignment of job duties might qualify as an adverse employment action, "depend[ing] upon the circumstances of the particular case." Id. at 71.

The Second Circuit has held that actions such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities" may qualify as adverse employment actions for purposes of a retaliation claim. Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999)). Vaughn has alleged that her classroom was reassigned for the purpose of placing her under the direct and constant scrutiny of Williams and that this reassignment marked the beginning of a series of acts of retaliatory harassment. Compl. ¶9(A)(y). These allegations, if true, would be enough to amount to an adverse employment action. The defendants, as moving parties, bear the burden of demonstrating the contrary by undisputed evidence, and they have not done so.

Even if defendants have not met their burden of demonstrating that Vaughn cannot satisfy the *de minimis* burden required for a *prima facie* case of retaliation, they could yet prevail if they can show legitimate business reasons for their allegedly retaliatory actions that Vaughn is unable to rebut. Defendants have in fact created a voluminous record, providing explanations for many of the actions Vaughn characterizes as retaliatory. Nowhere in this record, however, have

defendants provided an explanation for the reassignment of Vaughn's classroom. While this Court can easily imagine any number of legitimate reasons why a teacher's classroom might be reassigned, under the McDonnell Douglas framework it is the defendants' burden to present evidence of such a legitimate reason. Defendants have not done so, and thus, they have not met their burden and are not entitled to summary judgment on Vaughn's Title VII retaliation claim.

### c. Angela Cammarata

#### i. Discrimination

Cammarata alleges that she was subject to a series of discriminatory acts,[13] including unsatisfactory year-end ratings, culminating in her reassignment to Region 8 Human Resources[14] on August 31, 2006. Like Vaughn, Cammarata is unable to present any direct evidence of discriminatory animus. Nor has she been able to cite specific circumstances surrounding her treatment which would justify an inference of discrimination. Rather, her claim is entirely dependent on an inference drawn from an alleged pattern or practice of discrimination against teachers of Caribbean national origin. For reasons already discussed, this claim must fail and defendants are entitled to summary judgment.

#### ii. Retaliation

---

[13] In October 2003, Cammarata filed an earlier complaint against the Board of Education alleging violations of due process. On April 5, 2005, Cammarata executed a release, which released the Board of Education and "all respective successors, or assigns, and any and all past or present officials, employees, representatives and agents of the DOE, or the City of New York, as well as their respective successors or assigns" from all claims resulting from anything occurring on or before April 5, 2005. Klepfish Decl. Ex OOOOOO, Waiver and Release, dated April 5, 2005. To the extent that Cammarata alleges discriminatory actions prior to April 5, 2005, these allegations will be disregarded.

[14] Region 8 Human Resources is informally known as the "rubber room." See Steven Brill, The Rubber Room: The Battle Over New York City's Worst Teachers, New Yorker, Aug. 31, 2009, *available at* http://www.newyorker.com/reporting/2009/08/31/090831fa_fact_brill.

Cammarata participated in the June 21, 2005 demonstration protesting alleged anti-Caribbean discrimination.  She alleges that she suffered retaliation as a result of this protected activity.  In support of this allegation, Cammarata notes that during her deposition, Jennings specifically recalled Cammarata's presence at the demonstration.  Wotorson Aff. Ex 196, Jennings Dep. 154:10-14.  The recollection of her participation in the demonstration, according to Cammarata, supports an inference of retaliation by Jennings.  Pls.' Br. 33.  The defendant's knowledge of the plaintiff's participation in a protected activity, however, is a separate element of the *prima facie* showing of retaliation.  Jute, 420 F.3d at 173.  If an inference of retaliation were to be drawn solely from this knowledge, the causal connection element would be entirely superfluous.  Further, the Court does not find it reasonable to infer that retaliation naturally follows from an employer's awareness of an employee's protected activity.

Cammarata must thus rely on an inference of retaliation drawn from the temporal connection between the demonstration and the alleged retaliatory acts.  Defendants argue that because Cammarata's reassignment to Region 8 Human Resources occurred more than a year after the demonstration, no inference of retaliation can be drawn based on timing.  This would be a strong argument were the reassignment the only basis for the retaliation claim, but Cammarata was also subject to a series of reprimands and disciplinary actions beginning as early as September 8, 2005 and continuing throughout the school year.  Defs.' 56.1 Statement ¶ 173-175, 177, 179, 184-187, 189; Pls.' 56.1 Statement ¶ 173-175, 177, 179, 184-187, 189.  A gap of only a few months (especially when those months include the summer break) would not preclude an inference of retaliation.  In this case, however, any attempt to draw such an inference based solely on chronology is defeated by the fact that Cammarata was subject to a number of similar reprimands and disciplinary actions in the school year *prior to* her participation in the

29

demonstration. Defs.' 56.1 Statement ¶¶ 155-162, 164, 166-169; Pls.' 56.1 Statement ¶¶ 155-162, 164, 166-169. In other words, Cammarata had already been subject to reprimands and disciplinary actions similar to those she characterizes as retaliatory before her participation in any protected activities. See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Because Cammarata cannot make a *prima facie* showing of retaliation, defendants are entitled to summary judgment on this claim.

### d. Christelene Henry

#### i. Discrimination

Henry alleges that she has been subject to ongoing discriminatory treatment which has included negative lesson evaluations, reprimands, and an unsatisfactory year-end rating. Henry has no direct evidence of anti-Caribbean bias on the part of Jennings, Williams, or other SSCHS administrators, and thus must rely on indirect evidence to support an inference of discriminatory intent.

In her complaint, Henry sought to raise such an inference by showing that a similarly situated non-Caribbean teacher received more favorable treatment than she did. Compl. ¶¶ 9(C)(n)-(r). See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."). Henry alleged that she was admonished by Jennings for providing inappropriate teaching materials to students, while a non-Caribbean teacher accused of similar conduct was not disciplined. In fact,

as Henry no longer disputes, the non-Caribbean teacher was reprimanded by Jennings. (Defs.'
56.1 Statement ¶ 96; Pls.' 56.1 Statement ¶ 96).

Henry also argues, like Vaughn, that she was perceived as harboring an anti-American or
anti-African-American animus, and that this supports an inference that the administrators
developed a reciprocal discriminatory animus against her. Pls.' Br. 26-27. For reasons already
discussed, this argument is entirely without merit, and no such inference can be drawn.

Finally, Henry has argued that an inference of discrimination can be drawn from the fact
that during the time Henry has been at SSCHS no Caribbean born English teacher has been
allowed to read the dictation portion of the English Regents Exam.[15] But this argument must fail
for the same reason plaintiffs' pattern or practice argument failed—Henry provides no context
within which to evaluate this allegation. How many teachers are there in the SSCHS English
department? How many are of Caribbean national origin? How many read the Regents Exam
dictation each year? Without at least this information it is impossible to evaluate this alleged
disparate treatment of English teachers of Caribbean national origin.

Because Henry cannot demonstrate circumstances giving rise to an inference of
discrimination, her national origin discrimination claim must fail. An inference of discrimination
on the basis of alienage is equally unavailable, and Henry's claim under § 1981 must also fail.
Henry's claim for alienage discrimination is further undermined by the fact that plaintiffs'
complaint alleges similar treatment of citizen and non-citizen teachers. For example, plaintiffs
allege that both Henry and Vaughn were perceived as being anti-American, and that as a result,

---

[15] Curiously, Henry's EEOC complaint alleges that she was allowed to read for the Regents Exam in 2005. This fact
is absent from the complaint in this Court, which maintains only that "since Plaintiff has been employed at Science
Skills no Caribbean born English teacher has been allowed to read the questions and instructions and dictation at the
English Regents Exam." Compl. ¶ 9(C)(y).

Williams and Jennings discriminated against them reciprocally. It is difficult to see how this alleged animus could be directed against Henry due to her lack of citizenship, while at the same time directed at Vaughn, a U.S. citizen, on the basis of her national origin. Defendants are entitled to summary judgment on these claims.[16]

### ii. Retaliation

Henry alleges that she was retaliated against after participating in the June 21, 2005 demonstration. In her case, however, there was a substantial gap between the demonstration and any allegedly retaliatory actions. Henry complains that on September 22, 2006, she reported to Jennings that a student had threatened her, and that no investigation followed this report. This alleged incident is fully fifteen months after the demonstration. No reasonable inference of a causal connection can be drawn from events separated by such a large period of time.[17]

Henry's § 1981 retaliation claim must also fail. As an initial matter, it is necessary to consider when Henry engaged in protected activities under § 1981. Henry has alleged no facts which would support this claim. Prior to the complaint in this Court, none of the potentially protected activities engaged in by Henry—the meeting between teachers and administrators,[18] the demonstration, the EEOC complaint—involved complaints of discrimination on the basis of

---

[16] Defendants also argue that Henry cannot show that she has suffered any adverse employment action. Because Henry cannot show circumstances giving rise to an inference of discrimination, the Court need not reach the adverse employment action question.

[17] Defendants' submissions also reveal that Henry's class was observed and reported on negatively twice in this time period, on March 8, 2006 and September 14, 2006 by a Regional Instructional Specialist ("RIS"). Defs.' 56.1 Statement ¶¶ 105, 107; Pls.' 56.1 Statement ¶¶ 105, 107. First, it is not clear from the record whether these reports, which contained observations of multiple teachers, were actually shown to Henry. If they were not, then they certainly cannot be adverse employment actions. Second, there is no evidence in the record that the RIS was aware of Henry's participation in the demonstration. Finally, even assuming the prior two points, the earlier of the two observations was more than seven months removed from the demonstration — too distant to draw a reasonable inference of causation.

[18] It is unclear which teachers were present for this meeting. On the basis of the record, only Vaughn and Francis can be identified as alleging attendance. Compl. ¶ 9(A)(o); Pls.' Br. 28.

alienage.  On the contrary, Henry alleged only discrimination on the basis of Caribbean national

origin, and participated alongside U.S. citizens raising the same complaint.  Because Henry did

not engage in activity on the basis of a class protected by §1981, there can be no valid §1981

retaliation claim.  See Choudhury v. Polytechnic Inst. of N.Y., 735 F.2d 38, 43 n.6 (2d. Cir.

1984) (distinguishing a case in which "§1981 is being used to proscribe retaliation for asserting

rights protected by §1981 itself" from one in which "a pre-existing statute [is used] to support a

retaliation claim based on a subsequently enacted statute").

Henry's retaliation claims must fail, and defendants are entitled to summary judgment on

these claims.[19]

### e.  Emily Francis

#### i.  Discrimination

Francis alleges that she has been subject to ongoing discriminatory treatment in the form

of allegations of lateness and excessive absences and denial of leave.  Francis has been unable to

identify any direct evidence of discriminatory animus on the part of Jennings, Williams, or other

members of the school administration, and thus must rely on indirect evidence to raise an

inference of discrimination.  Francis alleges that in her role as union representative she has

written letters and filed grievances on behalf of teachers, and that these teachers have been

"mainly Caribbean-born." Wotorson Aff. Ex. 94, June 2005 Report, at 2.  This allegation is

insufficient to support an inference of discrimination for the same reason the pattern or practice

argument fails.  Not only is the allegation made in vague terms, but no numerical context is

provided in which it can be evaluated.  It is not possible to draw a reasonable inference of

---

[19] Defendants also argue that Henry cannot show that she has suffered any adverse employment action.  Because Henry cannot show circumstances giving rise to a causal connection, the Court need not reach the adverse employment action question.

discrimination on the basis of such an impressionistic allegation. Francis's discrimination claim must thus fail, and defendants are entitled to summary judgment.[20]

### ii. Retaliation

In April 2004, Francis, along with other teachers, allegedly attended a meeting with members of the administration, including Jennings and Williams, at which they expressed their belief that the administration was engaging in anti-Caribbean discrimination. Pls.' Br. 28. Later, on June 21, 2005, Francis participated in a demonstration accusing SSCHS of anti-Caribbean discrimination. Wotorson Aff. Ex. 194, Deposition of Emily Francis, dated January 23, 2008, at 93:20-24. Francis alleges that she was retaliated against for engaging in protected activities.

Because Francis has no direct evidence of a causal connection between her protected activities and the alleged retaliatory acts, she must rely on timing to raise an inference of causation. No such inference may reasonably be drawn. The first negative action received by Francis following the April 2004 meeting was reprimand from Jennings alleging interference in supervisory duties on November 5, 2004, some four or five months after the meeting. Defs.' 56.1 Statement ¶ 134; Pls.' 56.1 Statement ¶ 134. There were no further negative actions until six months later when Francis received a notice concerning her attendance dated May 5, 2005. Defs.' 56.1 Statement ¶ 135; Pls.' 56.1 Statement ¶ 135. Following the June 21, 2005 demonstration, the first negative action toward Francis in the record was a notice related to attendance in April 2006. Defs.' 56.1 Statement ¶ 140; Pls.' 56.1 Statement ¶ 140. Notably, Francis received satisfactory year-end ratings in June 2004, June 2005, and June 2006. Defs.' 56.1 Statement ¶¶ 133, 138, 142; Pls.' 56.1 Statement ¶¶ 133, 138, 142. Under the circumstances, the long gaps in time

---

[20] Defendants also argue that Francis cannot show that she has suffered any adverse employment action. Because Francis cannot show circumstances giving rise to an inference of discrimination, the Court need not reach the adverse employment action question.

between the protected activities and any negative actions toward Francis do not suggest any reasonable inference of causal connection.  Defendants are entitled to summary judgment on this claim.[21]

### f.  Carol Davis

Davis alleges that she was subject to discriminatory treatment which ultimately culminated in her termination from SSCHS.  Davis, unlike the other plaintiffs, has a viable claim only under §1981, and thus in order to make her *prima facie* case, she must demonstrate that a reasonable inference can be drawn of discrimination on the basis of alienage.

In support of such an inference, Davis cites deposition testimony by Williams in which she confirms recording in a memorandum a conversation with Davis in which statements were made concerning differences between how things are done in the U.S. and Jamaica.  Wotorson Aff. Ex. 197, Deposition of Michele Williams, dated January 30, 2008, at 56:16-22.  The memorandum in question, dated September 17, 2002, is a communication from Williams to Sinclair titled "UNSAFE LAB CONDITIONS," in which Williams reported unsafe conditions in Davis's lab classes.  Klepfish Decl. Ex. B, Memorandum from Michele Williams to Robert Sinclair.  According to the memorandum, when Williams informed Davis that the students were working with Bunsen burner flames at unsafe levels, Davis "explained that in her country, the students worked with flames that high and it had never been a problem for them."  Id. at 2.  Contrary to the impression given in Davis's brief, Pls.' Br. 28, in the only account of this conversation in the record, it was Davis, not Williams, who raised the issue of how things are done in Jamaica.  Even assuming that it was Williams who raised the issue of differences

---

[21] Defendants also argue that Francis cannot show that she has suffered any adverse employment action.  Because Francis cannot show circumstances giving rise to a causal connection, the Court need not reach the adverse employment action question.

between American and Jamaican classroom practices, this statement in isolation is not enough to draw an inference of discrimination. Davis was a recent arrival to the United States, and her teaching experience prior to her employment at SSCHS was almost entirely in Jamaica. Wotorson Aff. Ex. 195, Deposition of Carol Davis ("Davis Dep."), dated January 23, 2008, at 29:8-21. Curricula, pedagogical methods, and teacher-student interactions may vary greatly between different schools, and this would be especially true across different countries. At this point, only weeks into the school year, Williams had already expressed concerns about Davis's teaching, Defs.' 56.1 Statement ¶ 9; Pls.' 56.1 Statement ¶ 9, and it doesn't seem unreasonable to suggest that unfamiliarity with the American school system and educational methods might be contributing to the problem.

Second, Davis argues that comments regarding her accent are evidence of discriminatory animus. Williams related to Davis that some students were complaining of difficulties understanding her. Wotorson Aff. Ex. 195, Davis Dep. 54:17-55:10. But communication difficulties between students and teacher are certainly a legitimate area of concern for an administrator, and if an accent is causing or contributing to such a problem, then it is undoubtedly legitimate for an administrator to raise it with the teacher. Plaintiffs themselves describe Davis as "heavily-accented." Pls.' Br. 28. Without more, it is hardly sufficient to create an inference of discriminatory intent. See Thelusma v. N.Y.C. Bd. of Educ., No. 02-CV-4446, 2006 WL 2620396 (E.D.N.Y. Sept. 13, 2006) (when there was no language used indicative of racial animosity, advice to take an accent reduction class is "consistent with a beneficent design to afford him the opportunity to improve his communication skills").

Finally, Davis reports that some students taunted her, saying that Williams would "send [her] back to [her] country." Wotorson Aff. Ex. 195, Davis Dep. 43:3-9. This statement, however,

comes from students, not from any of the defendants.  Davis urges the drawing of an inference of discriminatory intent only on the basis of another inference that the students' comments were made at the behest of, or at least with the approval of, Williams.  Pls.' Br. 29.  Davis's argument for this inference, however, is entirely speculative.

Even assuming these statements could be attributed to Williams, and that they were sufficient to allow an inference of discrimination, this merely shifts the burden of proof to defendants to show legitimate business reasons for Davis's termination.  Defendants have provided a series of reports of unsafe laboratory conditions, documentation of her repeated lateness, negative lesson evaluations, and her year-end evaluation which rates her punctuality unsatisfactory.  Defs.' 56.1 Statement ¶ 9-16, 18-23; Pls.' 56.1 Statement ¶ 9-16, 18-23; Klepfish Decl. Ex. N, Annual Professional Performance Review.  Notably, both Nancy Baldwin, the Assistant Principal in charge of attendance, and Principal Sinclair who recommended Davis's termination are of Caribbean national origin.  Defs.' 56.1 Statement ¶ 6, 8; Pls.' 56.1 Statement ¶ 6, 8.  Because the defendants have provided a legitimate business reason for her termination, the burden rests on Davis to demonstrate that it is pretextual.  She has not done so, and thus her claim must fail. See Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994) (stray remarks, in isolation, are not enough to undermine legitimate business reasons).  Defendants are entitled to summary judgment on this claim.

## CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is GRANTED as to all plaintiffs' discrimination and retaliation claims, except plaintiff Vaughn's claim for retaliation.

SO ORDERED.


Dated:          Brooklyn, New York
                May 24, 2010



                                          _____/s/_____
                                          I. Leo Glasser
                                          United States Senior District Judge

**Copies of the foregoing memorandum and order were electronically sent to:**

**<u>Counsel for the Plaintiffs</u>**

Ambrose W. Wotorson , Jr.
Law Offices of Ambrose Wotorson
26 Court Street
Suite 1811
Brooklyn, NY 11242-1118

**<u>Counsel for the Defendants</u>**

Isaac Klepfish
NYC Law Department Office of Corp Counsel
100 Church Street
New York, NY 10007